IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:20-CV-00039-KDB

| | |
|---|---|
| **ESTATE OF ANN RINK, by its Executor, MICHAEL RINK,**<br><br>Plaintiff,<br><br>v.<br><br>**VICOF II TRUST,**<br><br>Defendant. | **ORDER** |

**THIS MATTER** is before the Court on the parties' cross-motions for summary judgment (Doc. Nos. 53, 54). This dispute centers on the questioned legality of a complex series of financial transactions insuring the life of North Carolina resident Ann Rink and the ultimate recovery of the insurance proceeds by Defendant, a Delaware trust, upon Ms. Rink's death. Specifically, Ms. Rink's Estate filed this action alleging that it is entitled to the proceeds of Ms. Rink's life insurance because the insurance contract was illegal and prohibited by public policy as a "wager" on her life lacking a proper insurable interest. Defendant contends that the policy was entirely lawful.

The Court has carefully considered the parties' motions, their briefs and exhibits and oral argument on the motions from the parties' counsel on December 16, 2021. As a threshold ruling, the Court finds that North Carolina law governs Plaintiff's claims. Under the applicable North Carolina choice of law rules, transactions insuring the lives of North Carolina residents like Ms. Rink are governed by North Carolina law so long as there is a "close connection" between North Carolina and the interests being insured. Although there is a substantial connection between the transaction and the Delaware trusts involved in purchasing and paying for the policy, the

1

determination of the lawfulness of the insurance policy in dispute must in the end be decided based on whether there is a proper insurable interest, a question which is focused, at least in significant part, on Ms. Rink and her purpose and intentions in agreeing to the transaction. Therefore, there is a sufficiently "close connection" between North Carolina and the alleged insurable interests at issue here.

However, contrary to Defendant's argument, the choice of North Carolina law is not dispositive in its favor. While North Carolina does not have a statute regulating these types of transactions like Delaware, North Carolina has long prohibited "wagers" on the lives of its residents in the absence of an appropriate insurable interest. And, most relevant to the pending motions, whether or not such a "wager" and legitimate "insurable interest" exists here is a matter of sharp factual dispute between the parties. Accordingly, as discussed below, neither party is entitled to summary judgment and their cross-motions will be denied.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co., et al.*, 946 F.3d 201, 206 (4th Cir. 2019).

A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted).

In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores,* 888 F.3d at 659 (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)); *see Modern Mosaic* at *2. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

3

## FACTS AND PROCEDURAL HISTORY

As is sometimes the circumstance in the matters before the Court, the one-sided recitation of the alleged "facts" by each of the parties is itself a strong reflection of their views of the merits. From Plaintiff's perspective, the insurance policy sold to Ms. Rink is the byproduct of a complex "scheme" promoted by the "Coventry" family of companies to "to manufacture policies through the use of short-term non-recourse premiums finance loans" for later sale as "life settlement" investments. However, in Defendant's telling, Ms. Rink simply bought an insurance policy as part of her estate planning, obtained a favorable loan to pay for the policy premiums and decided to relinquish the policy when it became (in her family's view) a bad investment that could not be profitably sold. Then, years later, the Defendant purchased the policy as a commercial investment and redeemed it when Ms. Rink died. As discussed below, a jury will ultimately decide which party's version of the facts will prevail. Therefore, the Court will only outline here the factual framework necessary for its holdings.

In 2005, John Bryan Setzler, an insurance agent in Hickory, North Carolina, approached the Rink family about purchasing life insurance. At the time, Ann Rink was a 73-year old woman who ran a cemetery in Hickory, and her husband Francis was a retired CPA. Mr. Setzler proposed that the Rinks consider a policy through the alleged "Coventry program," which involved purchasing the policy using a non-recourse loan (which meant there would be no financial risk to the Rinks) to pay the premiums for the first 26 months of the policy. After 26 months, Ms. Rink would have the option of selling the policy or paying off the loan and keeping the policy (although the parties disagree on how much keeping the policy was a real option for the Rinks).

On January 26, 2006, Coventry sent a letter to Ms. Rink enclosing the transaction package for the proposed policy and loan. The transaction included the creation of the Ann Rink

4

2006 Insurance Trust (the "Trust"), a Delaware statutory trust, so the Trust could apply for and own the Policy. Wilmington, Delaware is the home of the Trust and Wilmington Trust and Michael Rink (Ann Rink's son) are the directed and named co-trustees.

Also to be created as part of the transaction was the Ann Rink 2006 Insurance Trust, Premium Finance Sub-Trust (the "Sub-Trust"). The transaction contemplated that the insurance policy on Ms. Rink's life, once applied for and issued, would not be held by the Trust, but would instead pass directly to the Sub-Trust, which would in turn take out a loan to pay the premiums and simultaneously pledge the "Policy, and all proceeds thereof," as the sole collateral for a non-recourse loan. During the term of the loan, the Trust was prohibited from holding any property other than the "Initial Trust Estate" (set at $1) and the Sub-Trust was prohibited from holding any property other than Ms. Rink's insurance policy.

The transaction package also included a Note and Security Agreement ("Note") establishing a non-recourse loan between the Sub-Trust as borrower and LaSalle Bank as lender for 26 months (not coincidentally 2 months past the Policy's legal contestability window). The executed Note financed over $250,000 in premiums, which, plus fees and interest, required a payoff of approximately $370,000 at maturity (reflecting a listed interest rate of 17.79%) or relinquishment of the Policy.

Finally, the transaction documents included, among other trust supplement and security agreements, two power of attorney forms. The first required appointing Coventry as Ms. Rink's attorney-in-fact "with full powers of substitution to act in [her] name," place and stead for the purpose of "(i) authorizing the release of [her] Medical Records" and "(ii) originating and/or servicing any life insurance policies insuring [her] life" including the "power to complete and execute any applications or other documents in connection with the maintenance, or liquidation

5

of the Policies." The second required appointing Coventry as attorney-in-fact for Michael Rink, in his capacity as the named co-trustee of the Trust and Sub-Trust respectively, with "full powers of substitution to act in [his] name, place and stead for the purpose of it originating, maintaining, servicing, and/or liquidating . . . any life insurance policies . . . which are owned by the Trust.

On or around February 6, 2006, Ms. Rink, through Mr. Setzler, applied to Phoenix Life Insurance Company ("Phoenix") for a $5 million policy on Ms. Rink's life. The Trust was the owner and beneficiary of the Policy, and the beneficiary of the Trust was Francis Rink. Thus, if Ms. Rink had died while the Trust owned the Policy, Mr. Rink would have received the death benefit. Ms. Rink and Mr. Setzler signed the application in North Carolina and the Trust signed the application in Delaware (using the same signature dates). Phoenix rejected the $5 million proposal and, instead, offered a $1.5 million policy. On February 23, 2006, PHL Variable Insurance Company ("PHL) issued policy No. 97516364 (the "Policy"), providing $1.5 million in coverage with a rider for the return of premiums paid. The parties disagree on where the Policy was delivered – either to Ms. Rink in North Carolina or to Wilmington Trust Company as owner in Delaware (or, perhaps, to both separately). The Sub-Trust paid the first year's premium of $78,363 by wire on February 27, 2006. Neither Ms. Rink, nor anyone in her family, paid any amount toward the premiums at any time.

In March of 2008, the Rinks tried to sell the Policy, working with two separate life settlement brokers, who auctioned the policy to investors. No investor made a bid for an amount greater than the payoff amount of the outstanding balance on the Loan. Rather than pay off the Note and keep the Policy, the Rinks decided to relinquish the Policy to the lender. Pursuant to a Loan Satisfaction Letter dated May 6, 2008, the Sub-Trust "executed documents necessary to effectuate relinquishment and satisfy [the] outstanding obligations

under the Loan," which meant that the Sub-Trust's "indebtedness under the Note and Security Agreement [had] been satisfied in full…." On July 25, 2008, the Trust (owned and controlled by Coventry Capital) sold the Policy to Coventry First for $84,000.

In May 2018, Vida Capital, an investment firm acting through VICOF, purchased the Policy from Coventry-owned and controlled entity LST III, LLC. At the time of the sale, Ms. Rink had a life expectancy of only 40 months and a high dementia rating of 450%. Based on these statistics, VICOF paid approximately $1.4 million for the Policy that then had a death benefit of $2.2 million. Ann Rink died on October 5, 2018, less than five months after VICOF purchased the Policy and before it paid any premiums. VICOF filed a claim for the Policy's death benefit, which Phoenix paid on January 2, 2019. The death benefit totaled $2,243,612.24, from which VICOF realized a profit of $756,612.24.

On March 24, 2020, Ms. Rink's Estate, which was created in and exists under North Carolina law with a North Carolina resident Executor, commenced this action by filing the initial Complaint, which was then amended. (Doc. No. 3). The first count, "recovery of insurance proceeds due to lack of insurable interest," alleges a) that the Policy is "controlled by and subject to Delaware law," b) that the Policy lacks insurable interest, and c) under Delaware law, "[w]here an insurance company pays the death benefit on a policy lacking insurable interest the 'executor or administrator' of the insured is entitled to recover such benefits from the beneficiary… that received the benefits as a matter of common law and statute." *Id*. at ¶¶ 23-29. The second count, unjust enrichment, alleges that VICOF's "acceptance and retention of the Policy's death benefit has enriched [VICOF], to the detriment of the Estate." *Id*. at ¶¶ 31-32. In its Answer to the Amended Complaint (Doc. No. 6), VICOF

7

asserted twelve affirmative defenses and seven Counterclaims seeking a declaratory judgment and other relief related to retaining the proceeds of the Policy.

## DISCUSSION

**I. Choice of Law**

The parties dispute whether North Carolina or Delaware law governs the Estate's claims. A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941). In North Carolina, under the principle of *lex loci contractus,* the substantive law of the state where the last act to make the binding insurance contract controls resolution of disputes relating to the contract. *Fortune Ins. Co. v. Owens,* 351 N.C. 424, 428, 526 S.E.2d 463, 466 (2000). The "last act to make the binding contract" is typically the delivery of the policy to the insured. *Id.*; *see Fed. Ins. Co. v. S. Lithoplate, Inc.*, 7 F. Supp. 3d 579, 583 (E.D.N.C. 2014). However, by statute North Carolina dictates that certain insurance policies are deemed to be "made in the State" and thus governed by North Carolina law based on the interests being insured. N.C. Gen. Stat. § 58-3-1 provides that:

> All contracts of insurance on property, lives, or interests in this State shall be deemed to be made therein, and all contracts of insurance the applications for which are taken within the State shall be deemed to have been made within this State and are subject to the laws thereof.

There is no dispute that the insurance policy at issue insured the life of Ann Rink, a lifelong North Carolina resident; therefore, unless it is not applicable to this case, Section 58-3-1 requires that the Policy be considered to have been made in North Carolina and subject to North Carolina law.[1]

---

[1] Plaintiff argues that Section 58-3-1 relates only to the "interpretation" of insurance policies, which it alleges is not at issue here. This is incorrect. Even putting aside the question of whether the legality of a policy is part of its "interpretation," the statute plainly has a broader application to all policies within its scope. Indeed, it appears that the statute directly sets the "loci" (where the contract is "deemed to be made") for the relevant policies for purposes of North Carolina's "lex loci" choice of law test.

Because of constitutional due process concerns, application of Section 58-3-1 has been limited to situations where there is a "close connection" between North Carolina and the interests insured by the policy. *Collins & Aikman Corp. v. Hartford Acc. & Indem. Co.*, 335 N.C. 91, 95, 436 S.E.2d 243, 246 (1993). Where such a connection exists, North Carolina law controls the interpretation of the insurance policy. So, the determinative issue before the Court becomes whether there is in fact a "close connection" between North Carolina and the interests insured by the Policy.

Notwithstanding that a North Carolina resident's life is being insured, Plaintiff contends that there is no close connection between the alleged insured interests and North Carolina because the owner of the Policy (by the initial application) is a Delaware trust, the policy premiums were paid by a Delaware sub-trust using funds obtained from a non-recourse note and the Policy was otherwise allegedly part of a complex financial scheme involving the use of the lives being insured as an investment event rather than a "true" insurance contract. While the Court acknowledges the substantial connections between Delaware and the transaction and the potential resulting "disconnect" between North Carolina and the Policy, the Court finds that there is a sufficiently close connection to North Carolina to apply North Carolina law consistent with due process. *See Rossman v. New York Life Ins.*, 19 N.C. App. 651, 652, 199 S.E.2d 681, 682 (1973) (applying North Carolina law in a dispute over a life insurance policy where the insured was a North Carolina resident at the time of his death); *Am. Realty Advisors v. Lexington Ins. Co.*, No. 18 CVS 5171, 2019 WL 4277312, at *5 (N.C. Super. Sept. 10, 2019) (applying North Carolina law to an insurance coverage dispute where there was "an adequately clear connection between North Carolina and the insured interests to apply Section 58-3-1 consistent with due process.")

First, the Policy insures Ms. Rink's life and had she died while the Trust owned the Policy (i.e. while the funds from the Note were paying the premiums) Mr. Rink, also a North Carolina resident, would have been entitled to receive the death benefits. At oral argument, Plaintiff candidly acknowledged that under its interpretation of Delaware law, the Policy would be unlawful so that even if the Rinks had paid off the premium loan and made future premium payments themselves the insurance company could have lawfully refuse to pay any death benefits under the statutorily "void" policy. Clearly, North Carolina has an interest in the protecting the legality of life insurance policies sold to and potentially redeemed by North Carolina residents to the extent they might differently be construed to be illegal under the law of another state.[2] Further, as discussed more below, the critical issue in this case is whether Ms. Rink had a legitimate insurable interest in the Policy or if it was instead primarily an illegal "wager" on her life. This question is substantially focused on Ms. Rink's true intent in purchasing the Policy, given all the circumstances of her family's financial situation as well as the complex details of the transaction. Thus, answering the core question in the case unavoidably involves North Carolina evidence and interests. In sum, all things considered, the Court finds that there is a "close connection" between North Carolina and the alleged insurable interests at issue so North Carolina law governs the Estate's claims.

## II.    Cross-Motions for Summary Judgment

The parties have each moved for summary judgment. Plaintiff argues, almost exclusively under Delaware statutory law, that the Policy is unlawful. Because the Court has declined to apply

---

[2] In other words, North Carolina has an interest in its residents being able to recover benefits under life insurance contracts that are legal under North Carolina law, even if they might not be enforced in other states. Accordingly, contrary to Plaintiff's contention, there is an actual, potential "conflict of law" between North Carolina and Delaware that requires the Court to consider and apply North Carolina's choice of law rules.

Delaware law, Plaintiff's Delaware based arguments cannot support summary judgment in its favor. In turn, Defendant argues that the application of North Carolina law means that it must prevail. The Court disagrees. Instead, the Court finds that there are disputed issues of material facts that prevent entry of summary judgment for either side under North Carolina law.

Although it has never been codified in statutory law as in Delaware, it has long been the law in North Carolina that while an insurance policy supported by a proper insurable interest is valid and may be freely sold and assigned, "wagering contracts on the duration of a human life are not allowed to stand." *Hardy v. Aetna Life Ins. Co.*, 152 N.C. 286, 67 S.E. 767, 768–69 (1910), citing *Warnock v. Davis*, 104 U. S. 775 (1881). "Where an insurant makes a contract with a company, taking out a policy on his own life for the benefit of himself or his estate generally, or for the benefit of another, the policy being in good faith and valid at its inception, the same may, with the assent of the company, be assigned to one not having an insurable interest in the life of the insured; provided this assignment is in good faith, and not a mere cloak or cover for a wagering transaction." *Id*. Accordingly, if Plaintiff establishes that the insurance contract at issue is a "wagering contract" covering a "mere speculative risk" rather than a proper insurable interest then the Policy is unlawful and void.

As discussed above, there is a substantial factual dispute between the parties on whether the Policy reflects a wagering contract. Plaintiff argues that the Policy was primarily only a "wager" on Ms. Rink's life lacking a legitimate insurable interest. In support of its claim, Plaintiff points to a disclosure and acknowledgement in the transaction documents by Ms. Rink and Michael Rink that the Trust Agreement and other documents "are not intended to satisfy Settlor [Ms. Rink's] estate planning needs and have not been designed as an estate planning tool." Doc. No. 55-25 (Settlor & Co-Trustee Disclosure Stmt.) at 1. Further, Plaintiff asserts that Ms. Rink could

not afford to pay the premiums for the Policy nor payoff the Note – which she had been assured she would never need to do. Doc. No. 55-29 (Fin. Stmt. of A. Rink and F. Rink, dated Apr. 30, 2007 (Rinks had $58,100 in cash, combined net income of $94,000); Doc. No. 55-13 at 4 (Ms. Rink not drawing salary in 2006). And, more generally, Plaintiff argues that the nature and promotion of the "Coventry program," which relied on non-recourse financing to insulate the insured from any financial risk and promised the possibility of short-term profit for the insured establishes that the Policy is a "wagering contract" rather than an effort to meet bona fide insurance needs. *See* Doc. No. 76 at pp. 4-5.

On the other hand, Defendant argues just as stridently that Ms. Rink had a legitimate insurable interest and need for insurance, which was met by the Policy. As evidence of its position, Defendant points to a "cover letter" submitted along with the application for the Policy which explained that the "goal for the Rink estate is upon the death of Ann and Francis, to leave the cemeteries [they owned] to [their son] Dana," who was "actively involved in the management and ongoing duties of the cemeteries," and to "use the life insurance policy that is applied-for with [Phoenix] to ultimately leave a similar amount to each of the other two sons." Doc. No. 53-3 at 2. Also, a "Statement of Client Intent" noted that the policy was being sought "for estate equalization among the three heirs to the estate." Doc. No. 53-5. Defendant also seeks to rely on the testimony of Mr. Setzler that the Rinks "knew they couldn't get any more life insurance on the dad, and they wanted life insurance to equal out everything." *See* Doc. No. 77 at 4. However, in discussing its arguments on the bona fides of Ms. Rink's insurable interests, Defendant candidly admits that the analysis of the insured's true purpose is "inherently subjective: [requiring that the trier of fact] discern[] the thoughts, goals, and intentions of insureds who sought policies years, sometimes decades, before…."

12

In summary, the Court finds that a reasonable jury could weigh the evidence and the credibility of the witnesses[3] on this "subjective" issue and find either that the Policy was an unlawful "wager" on Ms. Rink's life or that it was a valid and lawful Policy supported by a proper insurable interest. Therefore, there is a material factual dispute that must be decided by the jury, and the Court will accordingly deny both of the parties' cross-motions for summary judgment.

### III. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. The parties' Motions for Summary Judgment (Doc. Nos. 53, 54) are **DENIED;**

2. This case shall proceed to a jury trial on the merits in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: December 20, 2021

Kenneth D. Bell
United States District Judge

---

[3] For example, (and not intending to cast any aspersions on his integrity) Mr. Setzler (as well as the Rinks) had a personal financial interest in closing the transaction that the jury might consider in evaluating the accuracy of the representations made in the cover letter and statement of client intent discussed above.